UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

SCOTTIE LAYNE, JUDY LAYNE and            )
DEWAYNE LAYNE,                            )
                                         )
        *Plaintiffs*,                    )
                                         )        Case No. 4:09-cv-111
v.                                       )
                                         )        Judge Mattice
GRUNDY COUNTY, TN and JOHN BELL,         )
Individually and in his official capacity as )
a Grundy County Sheriff's Deputy,        )
                                         )
        *Defendant*s.                    )

## MEMORANDUM AND ORDER

Before the Court is a Motion for Summary Judgment [Court Doc. 29] filed by Defendants Grundy County, Tennessee and John Bell, individually and in his official capacity as a Grundy County Sheriff's Deputy. Defendants allege that Plaintiffs' claims fail as a matter of law and there are no issues of material fact such that summary judgment for Defendants would be appropriate.

For the reasons set forth below, Defendants' Motion for Summary Judgment [Court Doc. 29] will be **GRANTED**.

## I.    FACTS

The facts, viewed in the light most favorable to Plaintiffs, are as follows.

Plaintiffs Scottie Layne ("Mr. Layne") and Judy Layne ("Mrs. Layne") are husband and wife, and Plaintiff Dewayne Layne ("Plaintiff Layne") is their son. (Court Doc. 1, Compl. ¶ 1.) Plaintiffs allege that in the early morning of November 15, 2008, a Grundy County Sheriff's deputy came to their residence at 423 South 40th Avenue in Gruetli Laager, Tennessee to investigate a call about a domestic assault. (*Id.* ¶ 4.) Although the

deputy advised Plaintiff Layne to return to bed and left the residence, Defendant John Bell ("Deputy Bell") arrived shortly thereafter and entered the residence with a drug dog, without obtaining consent from Plaintiffs. (*Id.* ¶¶ 4-5.) Plaintiffs claim that Deputy Bell used the dog to search the house and then directed Plaintiff Layne to return to bed. (*Id.* ¶ 6.) The dog began walking on top of the kitchen counter and climbing all over the dishes, and Mrs. Layne asked Deputy Bell to prevent this, after which Deputy Bell threatened that he would let the dog tear down the walls. (*Id.* ¶¶ 6-7.) When Mr. Layne remarked that he didn't believe that Deputy Bell could have the drug dog in their house, Deputy Bell allegedly responded, "is he some kinda lawyer or something?" (*Id.* ¶ 8.) Due to the commotion, Plaintiff Layne came out of the bedroom to ask Deputy Bell to speak respectfully to his mother. (*Id.*)

At this point, Deputy Bell told Plaintiff Layne that he was being arrested and then "raked" his medicine off the night stand and took a prescription bottle. (*Id.*) Plaintiff Layne told Deputy Bell that he had a prescription for the medicine, but Deputy Bell arrested him and took him to the Grundy County Jail without telling Plaintiff Layne why he was being arrested. (*Id.* ¶ 9.) When they arrived at the jail, Deputy Bell took Plaintiff Layne to a jail cell and left him there without actually booking him into jail. (*Id.* ¶ 10.) While in jail, Defendants failed to provide Plaintiff Layne with his medication, and he was held without bond until November 17, 2008. (*Id.* ¶ 11.)

Defendants represent the following additional facts. First, Defendants assert that Deputy Bell received notice of the domestic assault call at the Layne residence. (Court

Docs. 30-2,[1] 33-4 & 40-1, Bell Dep. at 16-17.)  Deputy Bell responded to the call, as did

Deputy Deke Stone ("Deputy Stone").  (*Id.* at 17.)  When Deputy Bell approached Plaintiffs'

residence, a car occupied by Sonia Mainord ("Ms. Mainord") and Brandon Knight was

leaving.  (*Id.* at 19-20.)  Deputy Bell stopped the car and spoke with Ms. Mainord, who told

Deputy Bell that Plaintiff Layne had hit her and thrown her around the house.  (*Id.* at 21.)

Deputy Bell proceeded to Plaintiffs' residence and spoke with Plaintiff Layne, who told him

that Ms. Mainord had been stealing pills from him, which led to an argument.  (*Id.* at 28.)

Deputy Bell testified that he could see that the interior of the house was in disarray and

represented that he asked Plaintiff Layne for consent to enter the residence, which was

given.  (*Id.*)  Plaintiff Layne denied striking Ms. Mainord and told Deputy Bell that she had

gotten angry at him because he asked her to leave the bedroom after she woke him up

crunching ice.  (Court Docs. 30-2 & 33-1[2], Dewayne Layne Dep. at 30-31.)

After Deputy Bell initially spoke with Plaintiff Layne, he returned to Ms. Mainord and

told her Plaintiff's Layne's version of events.  (Bell Dep. at 30-31.)  At that point, Ms.

Mainord told Deputy Bell that Plaintiff Layne was selling pills out of the house and had a

pound of pot in his bedroom.  (*Id.* at 31-32.)  Deputy Bell then returned to the Layne

residence, asked Plaintiff Layne if he had anything illegal in his room and asked if he could

look around, to which Plaintiff Layne answered that Deputy Bell could search away.  (*Id.*

at 32-33.)  Deputy Bell found a pill bottle without a prescription label in Plaintiff Layne's

room and asked Plaintiff Layne if he had a prescription for the pills inside the bottle.  (*Id.*

---

[1]     Deputy Bell's deposition is included within this document at pages 2-4, 7-9, 17, 23, 25, 27, 29-30.

[2]     Plaintiff Layne's deposition is included within this document at pages 18 and 36-42.

at 34-36.) Plaintiff Layne stated that he did have a prescription, but he was unable to produce it. (*Id.* at 35-36.)

Deputy Bell then returned to his patrol car to retrieve the K-9 drug dog that routinely rides with him. (*Id.* at 36.) Deputy Bell took the K-9 dog into the Layne residence to search Plaintiff Layne's room, but the dog did not alert. (*Id.* at 40, 50-51, 59.) Because Deputy Bell could make no determination as to the domestic assault allegations of Ms. Mainord and the dog did not alert on any marijuana, he did not arrest Plaintiff Layne for domestic assault or possession of marijuana. (*Id.* at 59-60, 68.) He did, however, arrest Plaintiff Layne for possession of controlled substances because of the pills in the unmarked bottle for which Plaintiff Layne could not produce a prescription. (*Id.* at 59-60.)

Defendants represent that Deputy Bell arrested Plaintiff Layne at approximately 4:00 a.m. on November 16, 2008 and subsequently transported him to the Grundy County Jail. (Def.'s Br. at 4.) The jail records show that Plaintiff Layne was booked into the jail at 4:14 a.m. on November 16, 2008 by Cory Cleek ("Mr. Cleek"). (Court Doc. 30-4.) Mr. Cleek testified that it would not be possible for Plaintiff Layne to come in to jail at a date and time other than what was listed in the jail's "red book." (Court Docs. 30-2 & 33-7, Cleek Dep. at 15, 42-43.) Plaintiff Layne's bond was set at $3,000 and was satisfied on November 17, 2008, and Plaintiff Layne was released that day at 12:20 p.m. (Court Doc. 30-4.) The charges against Plaintiff Layne were ultimately dismissed because he produced a prescription for the controlled substances. (Court Doc. 40-3.)

As a result of this incident, Plaintiffs assert claims against Deputy Bell for illegal search, false arrest, and malicious prosecution. (*Id.* ¶¶ 13-15.) Plaintiffs assert that

Defendant Grundy County is also liable for these claims because the constitutional violations were consistent with the Sheriff Department's institutionalized practice and the actions of Deputy Bell were essentially ratified by the Department and the County. (*Id.* ¶ 16.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment -- and the Court to grant summary judgment -- "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting the presence or absence of genuine issues of material facts must support the position by "citing to . . . materials in the record, including depositions, documents, . . . affidavits or declarations . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may bear this burden by either producing evidence that demonstrates the absence

of a genuine issue of material fact, or by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. To refute such a showing, the nonmoving party may not simply rest on its pleadings. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see Anderson*, 477 U.S. at 249. The nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Celotex*, 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Anderson*, 477 U.S. at 254. Thus, if the plaintiff must ultimately prove his case at trial by a preponderance of the evidence, the Court must, on a motion for summary judgment, determine whether a jury could reasonably find by a preponderance of the evidence that the plaintiff's factual contentions are true. *See id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.    ANALYSIS

As a preliminary matter, the Court notes that Plaintiffs and Defendants recently stipulated to the dismissal of Grundy County as a party.  (Court Doc. 45, Stipulation of Dismissal.)  Accordingly, any claims against Defendant Grundy County are **DISMISSED WITH PREJUDICE**.  In addition, Deputy John Bell has been sued both individually and in his official capacity as a Grundy County Sheriff's Deputy.  "A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *see also Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).  Thus, the § 1983 claims against Deputy Bell in his official capacity would be claims against Grundy County and, in light of Grundy County's dismissal from this action, the Court sees no reason to maintain such claims.  Therefore, Plaintiff's § 1983 claims against Deputy Bell in his official capacity are **DISMISSED WITH PREJUDICE**.  The Court will review all remaining claims solely as to Deputy Bell individually.[3]

Defendant argues that he has raised the defense of qualified immunity, the application of which would result in the dismissal of Plaintiffs' claims.  (Court Doc. 30, Defs.' Br. in Supp. of Mot. for Summ. J. at 6.)  The doctrine of qualified immunity shields "'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Supreme Court has articulated a two-part test for determining whether a law enforcement

---

[3]    For ease of reference, the Court will refer to the sole remaining Defendant as either "Defendant" or "Deputy Bell."

officer is entitled to qualified immunity. *See Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596, 598 (2004); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009). Under this test, district courts should "decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson*, 129 S. Ct. at 816. The court must also determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* In *Pearson*, the Supreme Court held that the order of this inquiry was no longer mandatory and that district courts could decide which factor to address first under the circumstances of the particular case. *Id.* at 818. The Court finds that the instant case best lends itself to the traditional order; that is, the Court will first determine whether Plaintiffs have sufficiently alleged a violation of their constitutional rights and, if so, will then determine whether the rights violated were clearly established at the time of the violation.

Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law." *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005).

To establish a claim pursuant to § 1983, a plaintiff must demonstrate two elements: "(1) that he was deprived of a right secured by the Constitution or laws of the United

States, and (2) that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000). Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).

Plaintiffs have alleged the following violations of the Fourth Amendment to the United States Constitution: illegal search, illegal seizure, false arrest, and malicious prosecution. The Court will review each claim to determine if Plaintiff has sufficiently alleged a constitutional violation.

### A.    Illegal Search

"Generally, the government may not search an individual's home without the individual's consent or a search warrant supported by probable cause." *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007). Defendant argues that he had Plaintiff Layne's consent to enter the Layne residence and that the facts do not establish any violation of Plaintiffs' Fourth Amendment protections against illegal, warrantless search. (Defs.' Br. at 7.)

Plaintiffs claim that Deputy Bell lacked probable cause to search their house because there was no domestic assault emergency situation and he could not reasonably rely on the information provided by Ms. Mainord because of her reputation. (Pls.' Resp. at 7.) Plaintiffs further argue that there is a factual dispute as to whether Plaintiff Layne gave Deputy Bell consent to enter the home and whether Deputy Bell had consent to search the home. (*Id.* at 2, 8.)

Deputy Bell testified at his deposition as follows:

A:    I'm talking about Dewayne Layne came to the door. And I said, you know, what is going on? What happened? He said, she come in here and, he said, I caught her -- He said, I woke up and she was stealing my pills. And he said, so we got in a little argument over that. And I said -- And I looked and then I said, is that how the house got messed up? And he said, yeah, I guess, you know.

        And I said, well, I need to come in there and look around. And he said, okay, come on in.

. . .

Q:    Tell me how you go in the house.

A:    I asked to come in. Knocked on the door. He come to the door. And I asked to come in.

Q:    What happened?

A:    He said come in.

Q:    What happened after?

A:    I walk in.

. . .

A:    . . . And I'm talking to her and she says, look, he's got all kinds of pills in that house. He sells pills. He's got a pound of pot under the bed. Go in there with that dog and find it. It's under the bed, in a suitcase. That's her words.

Q:    And so what did you do?

A:    Well, I walked back in there and I said, look, I said, is there anything illegal in your room? He said no. I said, no guns, no drugs, no prescription medications you shouldn't have? He said no. And I said, well, I need to look anyway. I said, do you care? And he said, there ain't nothing in there that ain't prescribed to me. Go

> ahead, search away.
>
> So I walk in there and the first thing we find is that pill bottle that's not got a prescription label on it.

(Bell Dep. at 28, 30, 32-33.)  Defendant asserts that although Plaintiff Layne may have testified somewhat differently in his deposition, his testimony was so vague and equivocal as to make it far less than a genuine issue of material fact, and Deputy Bell's testimony makes clear that he had consent to enter the home.  (Defs.' Br. at 7-8.)  Plaintiff Layne testified as follows:

> A:  I don't think he told me what he was there for.
>
> Q:  Did he just walk in without saying anything?
>
> A:  He sure did.
>
> Q:  Did you object to that in any way?
>
> A:  I tried.
>
> Q:  What does that mean?
>
> A:  I asked him what he was doing.
>
> Q:  And what did he say?
>
> A:  I'm coming in your house.
>
> Q:  And did you ask what for?
>
> A:  I say I did.  I don't know.  At that point, I went back in there and laid down on my bed.
>
> Q:  Okay.  And where was he?
>
> A:  He had done come out of my bedroom and was in the rest of the house.
>
> Q:  Okay.  Now let's back up a minute, because I am trying to find out when he first came to the door.

A:      All right.

Q:      When he first came to the door, your testimony is he just said I am coming in?  And if you don't remember, it's okay.

A:      He knocked on the door.  I opened the door and he just came in.  He didn't say anything.

Q:      Did you say what do you want or what are you doing –

A:      Yeah.

Q:      -- as he first came in?

A:      Yeah.

Q:      And what was his response?

A:      I don't really know.

Q:      Don't remember?

A:      Uh-uh.

Q:      And then as he came in, did you ask him to leave?

A:      Yeah.  I think I did.

Q:      You think you did?

A:      Yeah.

Q:      Well, did he respond to that in any way?

A:      I'm not real sure.

Q:      And when you just went back and went back to bed –

A:      He went in my bedroom with the dog.

(Dewayne Layne Dep. at 34-35.)

The Court finds the substance of Plaintiff Layne's testimony to be vague and

confusing. Plaintiff Layne was asked to give an account of "the details of the conversation when [Deputy Bell] came to the door, what he told you he was there for, what he wanted to do and what you said." (Dewayne Layne Dep. at 34.) Plaintiff Layne did not answer this question with any specificity and instead appears to be testifying that Deputy Bell came to the door, and after some interaction between the two, Plaintiff Layne returned to his bed. Deputy Bell then either went to his bedroom with the dog, or was already done searching the bedroom. At *most*, Plaintiff Layne may be asserting that he did not consent to Deputy Bell entering the residence, but there is nothing in Plaintiff Layne's testimony that would unequivocally establish that Plaintiff Layne did not give Deputy Bell consent to search.

In fact, even if the Court completely disregarded Deputy Bell's testimony, Plaintiff Layne's testimony establishes only that Deputy Bell came into the residence. It does not give the Court any information from which to find that Plaintiff Layne and Deputy Bell had a conversation during which Deputy Bell asked for consent to search and Plaintiff Layne refused to give consent. This is, quite frankly -- and at most -- no more than a "mere scintilla" of evidence; on these facts, no jury could reasonably find for Plaintiffs. *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court cannot conclude that Plaintiffs have successfully rebutted Defendant's assertion that no genuine issue of material fact exists as to this issue. Accordingly, Plaintiffs have failed to assert a constitutional violation for illegal search and this claim is **DISMISSED WITH PREJUDICE**.

### B. False Arrest

Defendant argues that this claim (only asserted as to Plaintiff Layne, for obvious reasons) must fail as a matter of law because Plaintiff Layne cannot establish that he was

wrongfully arrested when Deputy Bell had probable cause to arrest him. (Defs.' Br. at 8, 11.) Defendant contends that he had probable cause to arrest Plaintiff Layne upon discovery of the pills and upon Plaintiff Layne's failure to produce a prescription. (*Id.* at 8-9, 11.) Plaintiffs argue that Deputy Bell had no probable cause to arrest Plaintiff Layne. (Pls.' Resp. at 9.) Plaintiffs list several facts which they claim are in dispute--several which would be relevant to this claim--but the Court finds that none of these disputes involve material facts.[4]

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005). Probable cause exists "'if the facts and

---

[4]  Plaintiffs list the following facts in their Response, as they pertain to false arrest:

> 2.  Whether Deputy Stone was the first officer to discuss the domestic assault with Dewayne Layne and concluded there was no domestic assault.

> 3.  Whether the investigation for domestic assault had ended prior to Defendant Bell's entry of the Layne residence.

> . . .

> 6.  Whether the interior of the Layne residence "was in disarray" and "obvious that there had been a disturbance inside."

> . . .

> 9.  Whether Defendant Bell arrested Dewayne Layne in retaliation because Plaintiffs questioned his authority to search without a warrant.

> 10.  Whether Defendant Bell reasonably relied upon information allegedly provided by Sonia Mainord on the same day of the arrest.

(Pls.' Resp. at 2.) None of these facts are material. Because Plaintiff Layne was not arrested for domestic assault, the allegation that Deputy Stone arrived first and that the investigation into domestic assault was allegedly over are of no moment. Plaintiff Layne was arrested for possession of controlled substances when he could not produce a prescription for pills that Deputy Bell identified as controlled substances. Any query into Deputy Bell's entrance into the home and the reasonableness of such entry speaks to Plaintiffs' illegal search claim and has little to no bearing on Plaintiff Layne's ultimate arrest for a separate offense.

circumstances known to the officer warrant a prudent man in believing that the offense has been committed.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 250 (6th Cir. 2010) (quoting *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009)); *see also Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). "The establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Moncivais*, 401 F.3d 751, 756 (6th Cir. 2005) (citation and internal quotations omitted).

Plaintiffs have not satisfied their burden of producing significant probative evidence which would establish that Deputy Bell did not have probable cause for the arrest. The fact that Plaintiff Layne had a prescription for the pills, and the subsequent dismissal of the charges against him, are not facts which would suffice to challenge the arrest because Plaintiff Layne could not produce the prescription or prescription bottle for Deputy Bell at the time of the incident. Moreover, Plaintiffs' argument that the arrest was made for retaliatory or malicious reasons because Mr. Layne questioned Deputy Bell's authority has no bearing on the Court's probable cause determination.

At the time he made the decision to arrest Plaintiff Layne, Deputy Bell was confronted with an individual in possession of controlled substances and unable to produce a prescription to make that possession legal. There was clearly a probability or substantial chance of criminal activity, and Deputy Bell was not required to accept Plaintiff Layne's word that he had a prescription. Accordingly, the Court finds that Deputy Bell had probable cause to arrest Plaintiff Layne and concludes that Plaintiffs have not established any constitutional violation based on false arrest because this claim fails as a matter of law.

As such, Plaintiffs' false arrest claim is **DISMISSED WITH PREJUDICE**.

### C. Illegal Seizure

Defendant asserts that Plaintiff Layne cannot sustain an illegal seizure or due process claim because although he alleges that he was held in the jail for an excessive amount of time, the jail records show that Plaintiff Layne was booked into the Grundy County Jail at 4:14 a.m. on November 16, 2008 and released at 12:20 p.m. on November 17, 2008, for a total of about 20 hours. (Defs.' Br. at 9-10.) In the Complaint, Plaintiffs allege that "[u]pon arrival at the Grundy County Jail, instead of having the plaintiff , [sic] Defendant John Bell grabbed him and took him to a jail cell and left him without his actually being booked or a record being made that he was an inmate in the Grundy County Jail." (Compl. ¶ 10.) Plaintiff Layne testified that he was in jail for three days before his release, but he could not remember the exact date of his arrest. (Dewayne Layne Dep. at 18-19, 40.) Plaintiffs argue that the dispatch log has not been authenticated by a custodian of records and there is a printed date on the fingerprint sheet which indicates that Plaintiff Layne was likely fingerprinted on November 17, 2008 instead of when he was booked into the jail. (Pls.' Resp. at 9.)

The Fourth Amendment protection against unlawful seizure provides the basis for this due process claim because Plaintiff Layne was a free person at the time he was arrested and detained. *See Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). "The Supreme Court has held that individuals arrested and detained without a warrant are entitled to a 'prompt' judicial determination of probable cause." *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009) (citing *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975)).

"'Prompt' generally means within 48 hours of the warrantless arrest." *Id.* (citation omitted).

The Court has the following evidence before it with regard to when Plaintiff Layne's arrest took place: the phone/radio log which appears to track calls to 911, information sent to the officers from dispatch, and information from the officers back to dispatch; pages from the jail's "red book" which apparently tracks the booking process of new inmates; Plaintiff Layne's fingerprint card; and the deposition of Mr. Cleek, who booked Plaintiff Layne into the jail. (Court Docs. 30-3, 30-4, 30-5, Cleek Dep.) The Phone/Radio Log is dated from November 15, 2008 at 1800 (or 6:00 p.m.) through November 16, 2008 at 0600 (or 6:00 a.m.). (Court Doc. 30-3.) At 0228 hours (or 2:28 a.m. on what would be November 16, 2008), there is a notation dispatching officers to 423 South 40th Avenue in Gruetli Laager because Mr. Layne was reportedly beating up his girlfriend.[5] (*Id.*) At 0230 hours, there is a notation that Unit 14 is en route, and at 0236 hours, a notation which reads "female suspect was told to stay put - she jumped into a truck and left stop her at the end of 40th." (*Id.*) There is not much else of substance regarding the stop at the Layne residence, although it appears that Deputy Bell was there until at least 0247 on November 16, 2008.

The jail's "red book" shows the page on which Plaintiff Layne's information was taken at the time he was booked. It reads that Plaintiff Layne was "in" at 0414 on November 16, 2008 and notes that Deputy Bell was the arresting officer. (Court Doc. 30-4.) The other end of the page reads that Plaintiff Layne was "out" at 1220 on November 17, 2008 on a $3,000 bond. (*Id.*) Mr. Cleek signed the page when Plaintiff was booked in, and another individual signed the page when Plaintiff was released. (*Id.*) The

_____

[5] The notation reads "Scotty Layne," Plaintiff Layne's father. The Court does not know why there is a discrepancy, but the Court has little information about the substance of the 911 call.

fingerprint card reads, under "Date of Arrest" and "Date Arrested or Received," November 16, 2008. (Court Doc. 30-5.) The individual taking the fingerprints signed and dated the card November 16, 2008. (*Id.*) On one page, by some of the fingerprints, the card reads "Lexmark T640 # 20081117-00:11" but it is unclear exactly what this means with respect to when the fingerprints were taken and when the card was printed. (*Id.*)

Mr. Cleek testified in relevant part as follows:

> Q: Okay. So when we look at time 4:14, 11-16-08, what does that 4:14 represent?
>
> A: That would be the time I wrote him in this book.
>
> Q: Okay. That's the time you wrote him in he book?
>
> A: Yeah. As what time – Looking back on this paperwork, it shows that he was arrested around 2. By the time that the officer got to the jail, got the warrants done and I got started on it, it would have been between – around that time.
>
> Q: Okay. And then 12:20, 11-17-08, who would have been there?
>
> A: The time that he was – This would have been the time he was released, and more than likely it would have been Johnathan Holt.
>
> . . .
>
> Q: . . . Do you remember Dewayne Layne coming in that night?
>
> A: No, ma'am. Not right off.
>
> Q: Okay. All right. So you can only tell me what your normal procedure is –
>
> A: Yes, ma'am.
>
> Q: -- and what these records reflect?

A:      Yes, ma'am.

Q:      Is it possible that Dewayne Layne could have come in
        on a different day than what you have there?

A:      No, ma'am.  There – well, like I say, there were only two
        people booked in on that, on – during – in that time
        frame, and they were both booked in – This one was
        booked in before midnight, and this one at 4 a.m.

Q:      Okay.

A:      I mean, I could understand him being booked in on a
        later date if we had been bringing in ten, fifteen at one
        time and it taking that long to get to the very last one.
        I can understand it then, but not on this night.

(Cleek Dep. at 40, 42-43.)  Mr. Cleek also testified that fingerprints would usually be taken

and the card printed immediately after booking.  (*Id.* at 19.)

The Court, therefore, has a wealth of information establishing that the incident and

Plaintiff Layne's arrest occurred on November 16, 2008, that he was booked into jail that

morning, and that he was released on November 17, 2008.[6]  In contrast, the Court has very

little evidence from Plaintiffs to support the allegation that Plaintiff Layne was held in jail

for three days in violation of the Fourth Amendment protections against illegal seizure.

Essentially, the only evidence produced by Plaintiffs is Plaintiff Layne's statement in his

deposition that he was in jail for three days, the statement in the Complaint that he was not

booked when he first arrived at the jail, and Plaintiffs' claim that the "20081117" mark on

---

[6]      Although Plaintiffs object to the admissibility of the dispatch log because it had not been
         properly authenticated, there is no specific argument asserted with regard to this objection.
         (Pls.' Resp. at 9.)  Plaintiffs merely state that "Dewayne Layne knows he was held in jail for
         three days or over 48 hours and believed the date of his arrest was November 15, 2008
         (Saturday), despite the dispatch log that has not been properly authenticated by a custodian
         of records."  (*Id.*)  Without additional information about this uncorroborated, conclusory
         assertion, the Court declines to rule on the document's admissibility.

the fingerprint card supports these allegations. Plaintiff Layne also testified, however, that he was not sure what date he was arrested. Specifically, he testified:

> Q:  . . . This incident, according to the complaint, happened in the early morning hours of November 15th, is that right?
>
> A:  I can't say it did. I don't know.
>
> Q:  You don't remember?
>
> A:  It was something they had on their paper. I don't know exactly. I know it was the early morning hours.
>
> Q:  Well, that's all it says, the very early morning of November 15th, 2008. You don't remember?
>
> A:  I don't know if that's the correct date.
>
> . . .
>
> A:  They said it was the 15th?
>
> Q:  That's what it says in your complaint.
>
> A:  I was locked up for three days, and when I got out, the numbers didn't match. The dates didn't match what – the day I was locked up. So I'm not sure. It was the 15th or the 16th.

(Dewayne Layne Dep. at 18-19.) It is clear to the Court that Plaintiff Layne does not remember when he was arrested with any accuracy, and because he acknowledges that he could have been arrested on November 16, his statement about being in jail for three days is inconsistent. If it is possible that he was arrested on November 16, and there is no dispute that he was released the afternoon of November 17, he was not in jail for three days. Simply put, Plaintiff Layne's inconsistent and uncertain testimony is not the sort of

evidence with which Plaintiffs can successfully assert the existence of a genuine issue of material fact as to this claim. *See Totman v. Louisville Jefferson Cnty. Metro Gov't*, 391 F. App'x 454, 465 (6th Cir. 2010) (finding that Plaintiff's uncertainty about the presence of an officer who allegedly used excessive force against him was not sufficient evidence which would create a genuine issue of material fact); *Novelis Corp. v. Anheuser-Busch, Inc.*, 559 F. Supp.2d 877, 888-89 (N.D. Ohio 2008) (uncertain testimony was "too vague to rise to more than, at best, a mere scintilla of evidence."). Accordingly, the Court concludes that Plaintiff Layne has not adequately asserted a constitutional violation based on illegal seizure and this claim is **DISMISSED WITH PREJUDICE**.

### D.     Malicious Prosecution

The United States Court of Appeals for the Sixth Circuit has acknowledged that a federal malicious prosecution claim can be brought pursuant to the Fourth Amendment and through 42 U.S.C. § 1983, but had not identified the elements of such a claim until its recent decision in *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010). *See Spurlock v. Satterfield*, 167 F.3d 995, 1005-07 (6th Cir. 1999); *Thacker v. City of Columbus*, 328 F.3d 244, 258-59 (6th Cir. 2003). In *Sykes*, the Sixth Circuit identified four basic elements: first, "the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant 'ma[d]e, influence[d], or participate[d] in the decision to prosecute.'" *Sykes*, 625 F.3d at 308. (citations omitted). Second, "the plaintiff must show that there was a lack of probable cause for the criminal prosecution." *Id.* (citations omitted). Next, the plaintiff must show that he suffered a "deprivation of liberty" beyond the arrest or seizure as a result of the legal proceeding. *Id.* at 308-09 (citations and internal quotations omitted).

Finally, "the criminal proceeding must have been resolved in the plaintiff's favor." *Id.* at 309 (citation omitted).

Defendant argues that he had probable cause to arrest Plaintiff Layne for the possession of controlled substances, and further assert that a magistrate judge found that Deputy Bell had probable cause during a hearing on that subject. (Defs.' Br. at 12.)

In the instant case, although Plaintiff can establish that a criminal prosecution was initiated against him, that Deputy Bell made, influenced, or participated in the decision to prosecute, that he was deprived of his liberty as a result, and that the criminal proceeding was resolved in his favor, Plaintiff Layne cannot establish that there was no probable cause for the prosecution. After Ms. Mainord informed him that Plaintiff Layne was selling pills out of the house, Deputy Bell found an unmarked pill bottle in Plaintiff Layne's bedroom with pills inside which Deputy Bell could identify as controlled substances. When Deputy Bell asked Plaintiff Layne to produce a prescription for the pills, Plaintiff Layne could not. Under the circumstances known to Deputy Bell at the time, there was probable cause to arrest Plaintiff Layne for the possession of controlled substances -- the Court has already found as such with regard to Plaintiff Layne's false arrest claim -- and to proceed with prosecuting those offenses. Accordingly, the Court concludes that Plaintiffs have not sufficiently alleged any constitutional violation based on malicious prosecution and that this claim fails as a matter of law. Plaintiffs' malicious prosecution claim is therefore **DISMISSED WITH PREJUDICE**.

### E.    State Law Claims

The Court has determined that Plaintiffs have not successfully produced any

evidence to support the existence of a genuine issue of material fact as to the claims arising from alleged violations of the rights afforded to Plaintiffs pursuant to the United States Constitution. There is therefore no need for the Court to address the second part of the qualified immunity inquiry. In the Complaint, however, it appears that Plaintiffs have asserted state law claims as well--namely, for false arrest and trespass, and perhaps for emotional distress. (Compl.)

Because the Court has dismissed all of the federal claims asserted pursuant to 42 U.S.C. § 1983 over which it had original jurisdiction, the Court can decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. 28 U.S.C. § 1367 provides, in pertinent part, as follows: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." *Id*. Pursuant to § 1367, it is "within the district court's discretion to decline to exercise jurisdiction over Plaintiffs' state-law claims once it dismisse[s] the federal claims." *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 853 (6th Cir. 2007). Moreover, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Robert N. Clemens Trust*, 485 F.3d at 853. Because the Court has dismissed all federal claims, the Court can identify no compelling reason to exercise supplemental jurisdiction over the state law claims. Accordingly, Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE**.

## IV.  CONCLUSION

For the reasons explained above, Defendants' Motion for Summary Judgment [Court Doc. 29] is **GRANTED**.  Plaintiffs' federal claims are **DISMISSED WITH PREJUDICE** and Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE**.

A separate Judgment will enter.

**SO ORDERED** this 30th day of March, 2011.

_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE